# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TYRONE BIENEMY**                                    **CIVIL ACTION**

**VERSUS**                                            **NO.    16-1967**

**N. BURL CAIN, WARDEN**                              **SECTION: "A"(5)**

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2).    For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Tyrone Bienemy, is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    In November 2009, he was charged, along with co-perpetrators, Chelsea Croft and Jonathan Veal, by grand-jury indictment with second-degree murder.[1]    On March 24, 2011, a jury found him guilty of the lesser offense

---

[1]  State Rec., Vol. 2 of 7, Grand Jury Indictment.    Croft subsequently pleaded guilty to an amended charge of manslaughter and was sentenced to 20 years imprisonment.    *Id.*, Minute Entries, 10/18/10 and 4/4/11.    Bienemy's and Veal's requests for severance were

of manslaughter.[2]    On July 22, 2011, he was sentenced to 40 years imprisonment.[3]    The State filed a multiple bill of information.    Following a multiple-offender adjudication held on May 3, 2012, he was adjudicated a second-felony offender, his original sentence was vacated, and he was sentenced to 80 years imprisonment.[4]

On direct appeal, Bienemy asserted that the evidence was insufficient to support his conviction and his enhanced sentence was excessive.    On May 1, 2013, the Louisiana Fourth Circuit Court of Appeal affirmed the conviction and sentence.[5]    On December 2, 2013, the Louisiana Supreme Court denied his application for a writ of certiorari.[6]

On March 3, 2014, Bienemy submitted an application for post-conviction relief to the

---

denied (*Id.*, Minute Entry, 10/15/10), and they were tried jointly.

[2]  State Rec., Vol. 2 of 7, Minute Entry, 3/24/11.    Co-defendant Veal was also found guilty of manslaughter.

[3]  State Rec., Vol. 2 of 7, Minute Entry, 7/22/11.

[4]  State Rec., Vol. 1 of 7, Minute Entry, 5/3/12.    The appellate court on direct appeal noted an error patent with respect to the trial court's failure to state that the sentence was to be served without benefit of probation or suspension of sentences as per Louisiana Revised Statute 15:529.1(G).    No correction was necessary as it was deemed to have been imposed with the proper restrictions regardless under Louisiana Revised Statute 15:301.1(A).    *State v. Bienemy*, 2012-KA-0712 (La. App. 4 Cir. 5/1/13), 116 So.3d 779, 788.

[5]  *State v. Bienemy*, 2012-KA-0712 (La. App. 4 Cir. 5/1/13), 116 So.3d 779.    State Rec., Vol. 6 of 7.

[6]  *State v. Bienemy*, 2013-KO-1266 (La. 12/2/13), 126 So.3d 498.    State Rec., Vol. 6 of 7.

state district court.[7]    In that application, he raised the following five claims:    (1) he was denied effective assistance of appellate counsel for failing to confer with him and failing to assign various claims on appeal; (2) he was denied fair judicial review of trial errors; (3) he was prejudiced by the prosecutor's remarks during closing argument and evidence withheld by the prosecution in violation of *Brady v. Maryland*; (4) the trial court erred in continuing with trial in the absence of jurors, failing to question two jurors despite the possibility of prejudice and instead compelling them to remain as jurors, and failing to give jury instructions; and (5) he was denied effective assistance of trial counsel for failing to object to the lack of jury instructions.    On March 20, 2014 the district court denied post-conviction relief.[8]    His related supervisory writ application was summarily denied by the Louisiana Fourth Circuit Court of Appeal on May 15, 2014.[9]    His supervisory writ application to the Louisiana Supreme Court was denied on June 1, 2015.[10]

On March 7, 2016, Bienemy filed his federal application for *habeas corpus* relief.[11]    In that petition, he raises the same grounds for relief as those considered by the state courts on

---

[7]    State Rec., Vol. 7 of 7, Uniform Application for Post-Conviction Relief.

[8]    State Rec., Vol. 7 of 7, State District Court Post-Conviction Relief Order signed March 20, 2014.

[9]    State Rec., Vol. 7 of 7, *State v. Bienemy*, 2014-K-0457 (La. App. 4 Cir. May 15, 2014).

[10]    *State ex rel. Bienemy v. State*, 2014-KH-1208 (La. 6/1/15), 171 So.3d 935; State Rec., Vol. 7 of 7.

[11]    Rec. Doc. 4, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus.

direct appeal and post-conviction relief.    The State concedes that he has exhausted his

remedies in the state courts and that the federal application is timely.    The State argues for

dismissal on the merits.[12]    Bienemy filed a reply to the State's response.[13]

### Facts

The following facts were established at trial and summarized by the Louisiana Fourth

Circuit Court of Appeal:

> Randell Riley was shot and killed in the early morning hours of August 4, 2009,
> at his home at 3205 Kabel Drive in Algiers. Officers responding to the call
> found Randell Riley lying partially on top of a weight bench on his back patio.
> The officers saw pieces of broken glass lying around Randell Riley's body, and
> a second story window directly above Randell Riley's body was broken. Inside
> the bedroom that had the broken window, officers found blood on the carpet,
> three nine millimeter casings on the floor, and bloodstains on the window
> sill.[14]    The crime scene technician who processed the scene identified various
> photographs that he took, including some that showed spent casings found in
> the second floor hallway, blood on the carpet in the entryway of the bedroom
> with the broken window as well as in the bedroom itself, and blood in the
> window area. He also identified photos of a safe that was found near the front
> door, as well as a camouflage-like mask, a camouflage-colored glove, and
> various blood samples.
>
> The court qualified Officer Troy Dickerson as an expert in the taking, analysis,
> and identification of fingerprints. He identified his report of his analysis of
> evidence in this case. He stated that he analyzed a black and gray safe and a
> piece of wood doorframe, but he was unable to find any fingerprints on either
> item. He stated that although the piece of doorframe had been marked as
> having a possible fingerprint in the bloodstain on it, he was unable to find a
> fingerprint on it. He examined the evidence eight days after it was collected.

---

[12]  Rec. Doc. 15.

[13]  Rec. Doc. 16.

[14]  Ms. Croft is not a party to this appeal.

The State then recalled the crime lab technician, who testified that although the bloodstain on the doorframe was wet when he first arrived on the scene, it was dry by the time he cut the piece of wood with the bloodstain out of the frame and then put a piece of tape over what appeared to be a fingerprint.

Dr. Cynthia Gardner, the forensic pathologist who performed Randell Riley's autopsy later that day, testified that Randell Riley sustained one gunshot wound to his chest which injured his diaphragm, heart, and lungs, and then exited his chest and lodged in his right arm. She estimated that this wound would have caused his death within minutes. Randell Riley also sustained two other gunshot wounds to his buttocks, and she agreed that the placement of these three wounds was consistent with someone being shot from the front and then turning away from the shooter. Dr. Gardner testified that the lack of stippling showed that the shots were fired from greater than two feet from the victim. She also stated that Randell Riley sustained a number of superficial injuries that were consistent with falling from a window. She testified that toxicology testing on Randell Riley was negative for drugs or alcohol.

Officer Kenneth Leary, qualified as an expert in ballistics and firearms examination, testified that he tested casings found at the scene and determined that they were all fired from the same nine millimeter gun. He also stated that the bullet retrieved during Randell Riley's autopsy was a nine millimeter bullet, but he could not tell if it was fired from the same gun that fired the casings because he would need the actual gun used in order to make that determination.

Patricia Joseph testified that Randell Riley, her son, lived with her at the time of his murder, as did as her grandson Lavante Riley and her granddaughter Lashanti Riley, the victim's nephew and niece. She stated that at the time, Randell Riley, whom she called Dell, was staying in the upstairs bedroom next to hers; Dell's bedroom was also across the hall from the bathroom, and her grandchildren were staying in a bedroom down the hall. She stated that her boyfriend Aaron Clark was also there that night.

Ms. Joseph testified that at approximately 9:00 p.m., Dell received a phone call and then left the house. He returned in about ten minutes with Chelsea Croft, whom Ms. Joseph had met the day before. Ms. Joseph stated that she went into her bedroom, and when she came back out around 10:00, she saw Ms. Croft in the bathroom, wearing a nightshirt and brushing her hair. She also noticed a cellphone sitting by the sink. Ms. Joseph checked on her grandchildren and

then went to bed.

Ms. Joseph stated that sometime after midnight, she thought she heard something and went out of her room to check on Lavante. She saw Ms. Croft coming up the stairs, fully dressed, and man was walking up behind her. Ms. Joseph testified that she told them both hello, and Ms. Croft opened the door to Dell's room a little and slipped inside. The man remained on the dark part of the stairs. She stated that she asked who was there, but the man did not respond. She described the man as a very large black man. She stated that she turned on the bathroom light, and the man came out of the stairwell holding a gun. He told her to get down on the ground, but she stated that at first she thought it was a joke. He repeated his order for her to get down and be quiet, and she complied, begging him not to do anything. She stated that she hollered, and Aaron Clark, who was in her room, opened the door, looked out, and then closed the door. She stated that Aaron Clark then opened the door again and came out into the hallway. Ms. Joseph testified that "Tyrone" held the gun on Aaron Clark while Aaron Clark picked her up from the floor. At that point, her grandson Lavante came out of his room, saying that he wanted to help his Uncle Dell. She stated that she held Lavante back, and the man backed them into the children's bedroom, where Lashanti was still in bed. The gunman pointed the gun at Lashanti and ordered her not to look at him because she knew who he was.

Ms. Joseph testified that she told the gunman that they did not know who he was, and she slammed the door to the children's bedroom shut. The gunman did not follow them into the room. She and Aaron Clark opened the window and got Lavante out onto the window ledge. She also climbed out on the ledge, and when she heard gunshots, she and Lavante jumped from the ledge. Lavante fell on top of her. She then saw two men running out of the house. She could only see the backs of the men, and she thought one of them might have had plaits in his hair. Ms. Joseph testified that she went back inside the house, upstairs to Dell's room, and found Ms. Croft inside. She asked Ms. Croft where Dell was, but Ms. Croft told her that she did not know, although she thought he may have gone out the window. Ms. Joseph went over to the window, looked down, and saw Dell lying on the ground. She ran down to him and called 911 from the cellphone that she had in her hand. She testified that she tried to breathe into Dell's mouth, but he died. The police then arrived.

Ms. Joseph testified that she knew Tyrone Bienemy, whom she described as a family friend. She admitted that she did not tell the police initially that she was

familiar with either of the perpetrators, but after speaking with Dell's friends, she told the police that Tyrone Bienemy was involved. She stated that her friend then gave the police the contact number for Tyrone Bienemy's mother.

Ms. Joseph identified the photograph of Dell's safe, which she stated he normally kept in the corner of the living room. After the shooting, she saw the safe sitting next to the front door. She admitted that she did not know what Dell kept inside the safe. She testified that after the shooting, she discovered that the house phone had been pulled from the wall; a breaker for the downstairs lights had been tripped; and some of the light bulbs had been taken out of their sockets. Ms. Joseph admitted that the man that she saw in the hallway had been wearing a camouflage mask, which only showed his eyes and part of his nose.

On cross-examination, Ms. Joseph stated that she did not see Ms. Croft come out of Dell's room after the shooting, nor did she see the man with the mask go into Dell's room. She did not see the second man until she saw both men running away from the house after the shooting, and neither man was wearing a mask at that time. She admitted that she had never seen Jonathan Veal before, and she never identified him. She also admitted that in her 911 call, she stated that she did not know the perpetrators because they were wearing masks. She stated that she did not remember if she told the officers who responded to the scene that she saw Tyrone Bienemy in her house, but she stated that she told Detective Catherine Beckett, the lead investigator, that the gunman resembled Tyrone Bienemy's shape and size. She did not remember if she told the detective that the gunman's voice was real deep, but a review of her statement showed that she did say that. She did not remember if she told Detective Beckett that the man she saw in the house was Tyrone Bienemy. Ms. Joseph insisted that she recognized Tyrone Bienemy's eyes. She also insisted that even if she did not tell Detective Beckett that the man she saw in the hallway was Tyrone Bienemy, she was certain he was the man.

On redirect, when shown her statement, Ms. Joseph testified that she was upset when she gave it. She stated that during the statement, she said that the gunman was someone that she knew. When she was asked in the statement if she recognized that person's voice, she said no because the voice was real deep, but she emphasized at trial that she never said that the voice was deeper than Tyrone Bienemy's voice. She could not identify the mask seized from the house as the one worn by the gunman in the hallway, stating that the mask on the gunman was thicker. She stated that the man in the hallway was close to

her, and she maintained that Tyrone Bienemy was the man in the hallway.

During re-cross, Ms. Joseph denied knowing about someone looking for Dell in connection with a check writing scheme. She stated that Dell was not working at the time of his murder. She also stated that she told Detective Beckett, but not during the statement, that one of the perpetrators had twists in his hair, but she could not remember if she told Detective Beckett about any other facial feature that the gunman had.

Janee Brumfield identified herself as Tyrone Bienemy's girlfriend. She stated that Jonathan Veal is Tyrone Bienemy's friend. She testified that on the evening of August 3, 2009, Tyrone Bienemy came home with a woman whose name she did not know, but the woman was nicknamed Puerto Rican Passion. She stated that Tyrone Bienemy told her that the woman was a friend. Ms. Brumfield testified that she, Tyrone Bienemy, and the woman went to Jonathan Veal's house, where they ate, and then she went to sleep because she was not feeling well. She stated that Tyrone Bienemy, Jonathan Veal, and the woman were not there when she next woke up. She dozed, and then later only Jonathan Veal and Tyrone Bienemy returned. She stated that later that night, she heard a conversation between Jonathan Veal and Tyrone Bienemy wherein Jonathan Veal told Tyrone Bienemy that he was stupid and not to worry. She stated that both men showered and changed clothes after arriving home. The next morning, Tyrone Bienemy told her that he had gotten a call from his mother, who told him that the police suspected him of being involved in a murder. Ms. Brumfield testified that Tyrone Bienemy told her that he spoke with Orlando Matthews, a police officer. She stated that Tyrone Bienemy told her that although he told the officer that he was going to meet him in thirty minutes, he did not intend to do so. Ms. Brumfield identified photographs of both Tyrone Bienemy and Jonathan Veal, but she insisted that they did not reflect how the men looked in August 2009.

On cross-examination, Ms. Brumfield testified that she never went to Randell Riley's house. She testified that she gave a statement to Detective Beckett, but the detective threatened to put her in jail for fifteen years as an accessory for lying. She stated that the detective also threatened to put Ms. Brumfield's name and photograph on television to embarrass Ms. Brumfield's mother, who is a police officer. She insisted that the police picked her up from her job and kept her at the police station for a long time. She stated that Tyrone Bienemy told her that he did not want to talk to the police because he was on probation for possession of marijuana. She denied seeing any blood on the defendants'

clothing or in the car, nor did she see a gun in the car.

On redirect, Ms. Brumfield admitted that she gave Detective Beckett two statements, and she lied in the first one because she did not want to be involved in the case. She admitted that she did not mention the other woman in her first statement because of the "nature of the situation," which she ultimately explained as Ms. Brumfield having a tattoo of Tyrone Bienemy's name on her back, and Tyrone Bienemy's acceptance of her despite the "issues" that she had. She reiterated that the other woman left that night with the defendants.

On re-cross, Ms. Brumfield testified that the defendants spent a lot of time together, and on the night of the murder, Jonathan Veal's girlfriend and their infant were also at Jonathan Veal's house. She stated that she did not mention the other woman during her first statement because the detective did not ask her about the woman. She insisted that although she saw the woman leave with the defendants, she did not see her actually get in the car with them.

Aaron Clark testified that he was also present on the night of the murder, having come to the house sometime between 10:00 and 11:00 p.m. He and Ms. Joseph went into her room to play cards and listen to music. Sometime later, they heard a noise, and Ms. Joseph left the room to investigate. He heard a shout, opened the door, saw the gunman, closed the door, and then opened it again and saw Ms. Joseph on the floor. His account of the incident basically tracked that of Ms. Joseph. In addition, he stated that he put Ms. Joseph behind him after picking her up from the floor, but she went around him and grabbed the gunman, whom he identified as Tyrone, although he did not know it was Tyrone at the time. He described them being forced into the children's room, where Ms. Joseph closed the door. He testified that Ms. Joseph and Lavante went out the window, and then he heard shots. He tried to get Lashanti out the window, and as he put his leg through the window, he looked out and saw two men running from the house, one of whom was the man from the hallway. He testified that the man was wearing a mask when he was in the hallway, but he did not think that the mask found at the scene was the one that the man was wearing. He only saw the second man from the back as the men were running away.

Aaron Clark stated that he went back into the bedroom and told Lashanti to remain there. He went into the hallway and tried to look into Dell's room, but the light would not work. He then went downstairs and saw Ms. Joseph and

Lavante coming up the stairs. He shut and locked the front door, and then he went back upstairs, where he encountered Ms. Croft. He stated that she was fully dressed and told him that she was leaving. He told her to stay because the gunmen might still be in the area. He then went downstairs to make sure that the back door was locked, and he heard Ms. Joseph shout that Dell was in the back yard. As he crossed by the front door, he saw the safe in the hallway along with a bag or purse. He went around them and went to the glass doors at the back of the house, where he saw Dell lying on the side of a weight bench. He went to Dell and yelled to Ms. Joseph to call the police. Ms. Joseph came into the back yard, and he went inside to check on the children. As he passed the front door, he noticed it was open again, and the children told him that Ms. Croft had gone. Aaron Clark testified that he went outside and down the driveway, and he tried to flag down a police car that was passing. A second police car stopped, and he told them that the "girl" had gone.

Aaron Clark testified that he knew that the gunman in the hallway was Tyrone Bienemy. He stated that when Ms. Joseph grabbed the gunman, she said the name Tyrone and asked him why he was "doing this." He admitted that he did not mention Tyrone Bienemy's name to the officers when they first arrived, nor did he mention it in his statement to the police. He stated that when he thought about it later, he remembered that Ms. Joseph had said the name Tyrone. He testified that he had known Tyrone Bienemy for many years, and it was not until he had calmed down that it dawned on him that the gunman was Tyrone Bienemy.

During cross-examination, Aaron Clark admitted that he did not know Jonathan Veal and did not see him that night. He saw only one gunman upstairs, who was wearing a mask that blocked his hair and his face from his nose down, but he knew that the man was Tyrone Bienemy. He explained that when he heard the confrontation in the hallway, he first thought it was Ms. Joseph and Dell arguing, but when he cracked the door he saw the gunman. He stated that at first he thought the gunman was "playing," but then Lavante came out of his room and said he wanted to help his Uncle Dell. With respect to Dell's safe, Aaron Clark testified that it was normally kept in the dining room, but he did not know what Dell kept in it.

Aaron Clark denied identifying Tyrone Bienemy based upon information that the police gave him. He agreed that he did not mention Tyrone Bienemy's name in his statement to the police, explaining that a police officer told him that he could not say that the gunman was Tyrone Bienemy because the

10

gunman was wearing a mask. He also admitted he did not mention Tyrone's name in the 911 call. He stated that he identified a photograph that contained several pictures including one of Tyrone Bienemy after he gave his statement, and he pointed out Tyrone Bienemy's photo. Aaron Clark denied knowing Dell's Uncle Milton or a man named Duck or August, who purportedly wanted to kill Dell because of money that Dell had taken from him. He also denied seeing anyone come to the house with a gun, looking for Dell.

Lavante Riley testified that he lived with his grandmother and was in the house the night that his Uncle Dell was killed. The State played the video of a statement that Lavante gave at the Child Advocacy Center. Lavante explained that at the time of the murder, Uncle Dell was staying in his room, and he was staying with his sister Lashanti in her room.

On cross-examination, Lavante testified that only his Uncle Dell opened the safe. Although he did not know what was in the safe, Lavante saw his uncle put money inside it. On the night of the shooting, he saw the girl (presumably Ms. Croft) walking back and forth between Uncle Dell's room and the bathroom with her cell phone, and then he thought that she went downstairs. He stated that his grandmother came out of her room to check on him, and he saw the girl go into his uncle's room, while his grandmother asked someone standing in the dark who he was. The man did not answer. She walked toward him, and the man backed up. His grandmother turned on the light, and the man pulled a gun. The man told his grandmother to get on the ground, and then his grandfather (presumably Aaron Clark) came out of the other bedroom, and the gunman trained the gun on him. Lavante testified that he tried to run to his uncle's room to help him, but his grandmother held him back. He stated that the girl was in the room with his uncle, but he did not see anyone else in there.

Lavante testified that in his statement, he mentioned that the door to his room was open as he went out the window, and he could see his Uncle Dell and at least one man fighting. He stated that when he and his grandparents went into his sister's room, the gunman turned and went toward his uncle's room, and he could see his uncle fighting with one of the men by the door to the room. He stated that he saw Tyrone Bienemy upstairs and saw Jonathan Veal as he was running away from the house. He admitted that he did not identify Tyrone Bienemy in his statement, but he explained that no one asked him who the perpetrators were. He then stated that his grandmother said that the perpetrators were Jonathan and Tyrone. He stated that he heard his grandmother and his uncle's friend Mooda talking about the murder after

talking with the police. She asked Mooda whom he knew who was "big," and then she said that Tyrone was the big man. Lavante testified that while they were watching television later, they saw a photo, and his grandmother told him that the person was Jonathan. He stated that his grandmother told him that although she could not tell him anything about what happened, she told him who did it. He admitted that he did not see the girl let the perpetrators into the house.

Detective Orlando Matthews was involved in the investigation of Randell Riley's murder. Soon after arriving on the scene, he spoke with people inside the house who gave him the name Tyrone and Tyrone's mother's phone number. He called the number and spoke with her briefly, and she told him that someone had already called her concerning the murder. He went to her house, and Tyrone was not there. However, Tyrone called while the detective was there, and he agreed to meet Detective Matthews at the house in thirty minutes. Detective Matthews testified that he waited over an hour, but Tyrone Bienemy did not appear.

Detective Matthews admitted on cross-examination that Jonathan Veal's name did not come up while he was there. He stated that he did not author any police reports, but he gave his notes to Detective Beckett, who was the lead investigator. He then turned over his notes to the defense and to the State.

Chelsea Croft testified with the help of an interpreter. She admitted knowing the defendants and the victim. She stated that she first met the defendants when she was working at a fast food restaurant; she did not remember where she met Randell Riley. She identified both defendants and testified that Tyrone Bienemy asked her to let him and Jonathan Veal into Randell Riley's house so that they could rob him. She stated that she was at Tyrone Bienemy's mother's house when he asked her to do this, and Tyrone Bienemy's girlfriend was present at that time. She stated that they went to Jonathan Veal's house, left to get food, and then returned to Jonathan Veal's house. She stated that the defendants dropped her off at another fast food restaurant, where she called Randell Riley to come and get her. She insisted that she saw no guns in the defendants' car, but she knew that they intended to rob Randell Riley because she heard them talking about it at Jonathan Veal's house.

Randell Riley picked her up and took her to his house, where they watched movies until Randell Riley went to bed. She went into the bathroom and then downstairs to open the door for the defendants. She then went back upstairs

and into Randell Riley's bedroom. She stated that Jonathan Veal came into the room with a gun, and he and Randell Riley fought. Then Tyrone Bienemy, who remained at the doorway, fired, and Randell Riley was shot. She stated that the defendants fled, and she was uncertain where Randell Riley went. She stated that she called her friend Bruce, who picked her up from a nearby gas station approximately fifteen minutes later.

Ms. Croft insisted that she did not know that the defendants intended to kill Randell Riley; they only told her that they were going to rob him. She did not remember either defendant telling her to go into Randell Riley's room. She admitted that she pled guilty to manslaughter in connection with Randell Riley's murder, and she agreed to testify against the defendants in order to get a lesser sentence. She insisted that she was telling the truth and that the State would charge her with second degree murder if she lied.

On cross-examination, Ms. Croft admitted that she was told that her plea deal would be void if she changed her story. She stated that Tyrone Bienemy's gun fired three or four times. She admitted that she only spoke to Tyrone Bienemy about the robbery, but she heard him and Jonathan Veal discussing it. She stated that Detective Beckett scared her when she gave her statement, and she did not use an interpreter during the statement. She stated that Detective Beckett did not question her about her friend Bruce. She denied orchestrating the murder, admitting only that she let them inside the house. She admitted that Randell Riley was involved in writing bad checks and defrauding some people, and she helped him in this scheme, but she did not tell Detective Beckett about this activity. She denied knowing anyone named Duck or August who was looking for Randell Riley. Ms. Croft admitted that she was pregnant at the time of the murder, but she insisted that the father of the child was none of the men involved in the murder or its aftermath. She insisted that she had no aliases, but she admitted that she was known as Puerto Rican Passion when she worked at a club. On redirect, she stated that she was in shock when Randell Riley was shot. She denied that Bruce was ever in Randell Riley's house or was involved in the shooting.

Officer Charles Stamps testified that he extradited Tyrone Bienemy from Harris County, Texas on August 26, 2009, and Jonathan Veal from Atlanta, Georgia on October 6, 2009. He admitted on cross-examination that he did not know if Jonathan Veal lived with his brother in Atlanta.

The parties stipulated that if Detective Beckett were to appear, she would

testify that officers found inside the residence, under furniture, something called a lamp cover and a Louisiana identification card in the name of Jonathan Franklin. They also stipulated that Detective Beckett would testify that she directed Daniel Dooley of the Child Advocacy Center to show Lavante a photograph of Tyrone Bienemy during his interview. They further stipulated that Detective Beckett directed that the mask and glove found at the scene be tested for trace evidence; that the glove yielded the presence of human blood and possible DNA; and that the mask yielded the presence of human blood, the possible presence of DNA, and one hair with possible follicular tissue.[15]

### Standards of Review on the Merits

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.    A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").    With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application

---

[15]    State Rec., Vol. 6 of 7, *State v. Bienemy*, 116 So.3d at 782-789 (footnote in original).

of, clearly established Federal law, as determined by the Supreme Court of the United States."

28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state-court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010). An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. A state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir.2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). "[E]ven a strong case for relief does not mean the state

court's contrary conclusion was unreasonable" under the AEDPA.    *Harrington v. Richter*, 562 U.S. 86, 102 (2011).    Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents."    *Harrington*, 562 U.S. at 102 (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants—and federal courts—from using federal *habeas corpus* review as a vehicle to second-guess the reasonable decisions of state courts.").

## Analysis

### A.  Sufficiency of the Evidence

Bienemy claims that the evidence was insufficient to support his conviction for manslaughter because the State failed to prove his identity as a perpetrator.    The state court rejected this claim on post-conviction review, reasoning as follows:

> By Tyrone Bienemy's first assignment of error and Jonathan Veal's only assignment, they contend that there was insufficient evidence to support their manslaughter convictions. They do not dispute that a manslaughter occurred; rather, each asserts that the evidence did not prove his identity as one of the perpetrators of the manslaughter.
>
> In reviewing a claim of insufficiency of evidence, courts must apply the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979): the court must determine whether the evidence, viewed in the light most favorable to the prosecution, "was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La. 1984). *See also State v. Brown*, 2003–0897 La.4/12/05), 907 So.2d 1; *State v. Batiste*, 2006–0875 (La. App. 4 Cir. 12/20/06), 947 So.2d 810; *State v. Sykes*, 2004–1199 (La. App. 4 Cir. 3/9/05), 900 So.2d 156. In addition, when the State uses circumstantial evidence to prove the elements of the offense, "La. R.S. 15:438

16

requires that 'assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.' " *State v. Neal*, 2000–0674, p. 9 (La.6/29/01), 796 So.2d 649, 657. *See also Brown*; *Batiste*; *Sykes.*

Although the defendants were charged with second degree murder, the jury found them both guilty of manslaughter, which is defined in La. R.S. 14:31 in pertinent part as: "(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection." Second degree murder is defined in pertinent part by La. R.S. 14:30.1A(2) as the killing of a human being: "When the offender is engaged in the perpetration or attempted perpetration of ... armed robbery ... even though he has no intent to kill or inflict great bodily harm." The victim in this case was shot and killed during an armed robbery, thus satisfying the elements of manslaughter.

The defendants argue, however, that the evidence did not prove beyond a reasonable doubt that they were the perpetrators. In *State v. Stewart*, 2004–2219, p. 6 (La. App. 4 Cir. 6/29/05), 909 So.2d 636, 639, this Court set forth the standard for determining whether the evidence was sufficient to prove identity as the perpetrator:

> When identity is disputed, the State must negate any reasonable probability of misidentification in order to satisfy its burden under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *State v. Edwards*, 97–1797 (La. 7/2/99), 750 So.2d 893; *State v. Woodfork*, 99–0859 (La. App. 4 Cir. 5/17/00), 764 So.2d 132. The reviewing court must examine the reliability of an identification according to the test set out in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977): (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness? [sic] degree of attention; (3) the accuracy of the witness' prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. *See State v. Brealy*, 2000–2758 (La. App. 4 Cir. 11/7/01), 800 So.2d 1116.

*See also State v. Williams*, 2011–0414 (La. App. 4 Cir. 2/29/12), 85 So.3d 759; *State v. Mathieu*, 2007–0204 (La. App. 4 Cir. 2/27/08), 980 So.2d 716. In

addition, as noted by this Court in *State v. Jones*, 2011–0649, p. 3 (La. App. 4 Cir. 10/19/11), 76 So.3d 608, 611: "In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. *State v. Robinson*, 2002–1869, p. 16 (La. 4/14/04), 874 So.2d 66, 79. Under the *Jackson* standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court. *State v. Juluke*, 98–341 (La. 1/8/99), 725 So.2d 1291, 1293."

Here, Patricia Joseph, Aaron Clark, and Lavante Riley all identified Tyrone Bienemy as the man who stood with the gun in the hallway outside the victim's bedroom. In addition, Chelsea Croft identified Tyrone Bienemy as the man in the hallway and Jonathan Veal as the man who went into the victim's bedroom and struggled with him. She also testified that Tyrone Bienemy fired his gun three or four times, striking the victim.

Both defendants argue, however, that these identifications are suspect. They point out that there was no physical evidence to tie them to the murder. With respect to the victim's family members who were in the house, Tyrone Bienemy argues that they did not give his name to the police in the 911 call; instead, they indicated that they did not know who the perpetrators were because the perpetrators were masked. Tyrone Bienemy asserts that they did not come up with his name until after conferring with the victim's friend, who gave them his name because he fit the general description of the man in the hallway. He points to the fact that Ms. Joseph agreed that the portion of the gunman's face that was visible from the mask would have showed his moles and a scar, yet Ms. Joseph did not indicate in her statement that the gunman had these marks.

Nonetheless, Ms. Joseph testified that even if she did not give Tyrone Bienemy's name to the police, she knew it was him, having known him for years. She also testified that when the gunman backed them into the children's room, he told Lashanti not to look at him because she knew him. In addition, Aaron Clark testified that although it did not dawn on him at the time and shortly after the murder that the gunman was Tyrone Bienemy, when he calmed down he remembered hearing Ms. Joseph ask "Tyrone" why he was pointing the gun at them while they were in the hallway. He insisted that he told an officer on the scene that the gunman was Tyrone, but he stated that he did not mention Tyrone's name in his statement to the police because an officer told him that he could not do so because the gunman was masked.

Although Lavante Riley also identified Tyrone Bienemy as the man in the hallway, he admitted that his grandmother told him who the perpetrators were.

With respect to Chelsea Croft's identification of both defendants, they both theorize that she merely agreed with Detective Beckett's assertion that they were the perpetrators in order to hide her own culpability and that of the father of her unborn child, whom she denied was any of the men involved in the robbery or her departure from the scene. The defendants argue that Ms. Croft admitted that she was threatened by Detective Beckett, and they assert that her mental condition was questionable. It is unclear upon what they base the latter argument because her mental condition was not raised at trial. They point out that Ms. Croft pled guilty in exchange for her testimony against them, and she admitted that her plea deal would be invalidated if she changed her testimony at trial.

The jury was aware of all of these factors, and it still chose to believe the witnesses' identification of the defendants as the men who attempted to rob the victim, during which robbery he was repeatedly shot and killed. Unlike this Court, the jurors were able to observe the demeanor of the witnesses and found them to be credible. A fact finder's credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence. *State v. Johnson*, 2009–0259 (La. App. 4 Cir. 9/16/09), 22 So.3d 205; *State v. Huckabay*, 2000–1082 (La. App. 4 Cir. 2/6/02), 809 So.2d 1093. Contrary to the defendants' arguments, the record does not show that the jurors abused their discretion in their credibility finding. This finding is bolstered by the testimony of Ms. Brumfield, who placed Ms. Croft with both the defendants on the night of the murder, testifying that Ms. Croft left with the defendants just prior to the murder. Although the defense theorized that the victim was killed as a result of someone whom the victim had defrauded through his check writing scheme, with which Ms. Croft admitted being partially involved, there was no evidence to support this theory, and the jury did not abuse its discretion by rejecting this theory.

Looking at the *Manson* factors, the family members knew Tyrone Bienemy prior to the murder, but they did not know Jonathan Veal, and none of them identified him as being at the scene. The gunman in the hallway had a mask on, but Ms. Joseph insisted that she recognized Tyrone Bienemy's eyes. She and Aaron Clark were focused on the gunman. The descriptions that they gave of the perpetrators was very general: two black men, one with a white shirt, and

the one in the hallway being big. They were both certain at trial, a year and a half later, that Tyrone Bienemy was the gunman in the hallway.

While a review of the *Manson* factors with respect to their identifications might not be sufficient to prove that the defendants were the perpetrators, Ms. Croft, who admitted the perpetrators to the house, positively identified them as the perpetrators. She had plenty of opportunity to view them, and her degree of attention was great, as she was a part of the robbery plan. It is unclear if she ever gave a description of them, but she was certain that they were the men whom she let into the house to rob the victim. She identified them when she gave her statement, which occurred a few days after the murder.

Considering all of the evidence adduced at trial, the State presented sufficient evidence for the jury to find beyond a reasonable doubt that the defendants were the men who attempted to rob the victim and shot him during the robbery. This assignment has no merit.[16]

The Louisiana Supreme Court denied relief without assigning additional reasons.

Because a sufficiency-of-the-evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."    28 U.S.C. § 2254(d)(1); *Taylor v. Day*, Civ. Action No. 98–3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), *aff'd*, 213 F.3d 639 (5th Cir. 2000).    For the following reasons, the Court finds that Bienemy has made no such showing.

Under *Jackson v. Virginia*, 443 U.S. 307 (1979), a federal *habeas* court addressing an insufficiency-of-the-evidence claim must determine, after viewing the evidence in the light

---

[16]    State Rec., Vol. 6 of 7, *State v. Bienemy*, 116 So.3d at 789-792 (footnotes omitted).

most favorable to the prosecution, whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Williams v. Cain*, 408 F. App'x 817, 821 (5th Cir. 2011); *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008). Thus, to determine whether the commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law. *Perez*, 529 F.3d at 594 (citing *Jackson*, 443 U.S. at 324 n. 16). The court's consideration of the sufficiency of the evidence extends only to what was presented at trial. *See McDaniel v. Brown*, 558 U.S. 120, 131, 130 S.Ct. 665, 672 (2010) (recognizing that a reviewing court must consider the trial evidence as a whole under *Jackson*); *Johnson v. Cain*, 347 F. App'x 89, 91 (5th Cir. 2009) (*Jackson* standard relies "upon the record evidence adduced at the trial") (quoting *Jackson*, 443 U.S. at 324).

Review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury. *United States v. Young*, 107 F. App'x 442, 443 (5th Cir. 2004) (citing *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993)); *see Jackson*, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). Thus, all credibility choices and conflicting inferences must be resolved in favor of the verdict. *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005).

A federal *habeas* court is not authorized to substitute its interpretation of the

evidence or its view of the credibility of witnesses in place of the fact-finder.    *Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir. 1995); *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985). In addition, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.' "    *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins*, 506 U .S. 390, 402 (1993) (emphasis added)).    Moreover, because the state court's decision applying the already deferential *Jackson* standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."    *Parker v. Matthews*, 567 U.S. 37, 43 (2012); *see also Coleman v. Johnson*, 566 U.S. 650, 132 S.Ct. 2060, 2062 (2012).

Bienemy was charged with second-degree murder, but convicted of the responsive verdict of manslaughter.    He disputes only the proof of his identity as one of the perpetrators, arguing that the State failed to negate the possibility that four witnesses, Patricia Joseph, Aaron Clark, Lavonte Riley, and Chelsea Croft, wrongly identified him as the individual who shot the victim during an armed robbery.    He disputes the accuracy of the victim's family members' identifications because they had only a fleeting opportunity—and one obscured by darkness and an inability to see the perpetrator's entire face—to view the alleged perpetrator.    Furthermore, because there was no physical evidence to link him to the shooting, he contends jurors acted irrationally by "accepting the presumption of the

family that the man in the dark hall must have been Tyrone Bienemy."[17]    He discounts the

testimony of Croft as entirely unreliable because she was a co-perpetrator and accomplice.

Here, as the Louisiana Fourth Circuit noted, Joseph, Clark and Riley all positively identified

Bienemy as the person they saw standing with a gun in the hallway outside of the victim's

bedroom.    Croft knew both defendants and testified that, as agreed upon beforehand, she

allowed them into the home so they could rob the victim.    She positively identified Bienemy

as the person in the hallway with the gun and the person who fired several times striking the

victim.    Although the defense tried to negate their identifications and prove their

inaccuracy, the jury chose to believe their testimony that it was Bienemy they saw with a gun

in the hallway outside the victim's room.    Furthermore, as the appellate court found, Croft

had ample opportunity to view the perpetrators and was positive they were the men whom

she let into the residence to rob the victim.    Even a single, uncorroborated eyewitness

identification, if found credible by the trier of fact, is constitutionally sufficient to prove

identity and support a conviction.    *United States v. King*, 703 F.2d 119, 125 (5th Cir. 1983);

*accord Davis v. Cain*, Civ. Action No. 15-6652, 2016 WL 4537915, at *7 (E.D. La. May 24, 2016),

*adopted*, 2016 WL 4529877 (E.D. La. Aug. 30, 2016); *Colbert v. Cain*, Civ. Action No. 14-2472,

2016 WL 4186551, at *11 (E.D. La. Apr. 12, 2016), *adopted*, 2016 WL 4161257 (E.D. La. Aug.

5, 2016); *Phillips v. Cain*, Civ. Action No. 11-2725, 2012 WL 2564926, at *13 (E.D. La. Apr. 11,

2012), *adopted*, 2012 WL 2565025 (E.D. La. July 2, 2012).

---

[17]  Rec. Doc. 4-1, p. 19.

In this case, jurors were made aware of all of the factors suggested by Bienemy that could have influenced their identifications and testimony, but nevertheless chose to believe the witnesses and found their testimony to be credible.    These credibility determinations will not be second-guessed by a federal *habeas* court.    When reviewing a sufficiency-of-the-evidence claim, a federal *habeas* court must defer to the trier of fact with respect to issues of conflicting testimony, weight of the evidence, and the credibility of the witnesses.    *Jackson*, 443 U.S. at 319; *see also Schlup v. Delo*, 513 U.S. 298, 330, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) ("[U]nder *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review."); *Ramirez v. Dretke*, 398 F.3d at 695.

When the evidence in this case is viewed in the light most favorable to the prosecution, it simply cannot be said that the guilty verdict was irrational.    Therefore, Bienemy cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.    Accordingly, under the doubly-deferential standards of review which must be applied by this federal *habeas* court, relief is not warranted.

B.  *Excessive Sentence*

Bienemy argues that his enhanced 80-year sentence as a second-felony offender was excessive.    On direct appeal, the Louisiana Fourth Circuit denied the claim citing the following:

The Supreme Court set forth the standard for evaluating a claim of excessive sentence in *State v. Smith*, 2001–2574, p. 7 (La.1/14/03), 839 So.2d 1, 4:

> Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that "[n]o law shall subject any person to • • • excessive • • • punishment." (Emphasis added.) Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762, 767 (La. 1979). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. *State v. Bonanno*, 384 So.2d 355, 357 (La. 1980). A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. *State v. Cann*, 471 So.2d 701, 703 (La. 1985). On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. *State v. Walker*, 00–3200, p. 2 (La. 10/12/01), 799 So.2d 461, 462; *cf. State v. Phillips*, 02–0737, p. 1 (La. 11/15/02), 831 So.2d 905, 906.

*See also State v. Johnson*, 97–1906 (La. 3/4/98), 709 So.2d 672; *State v. Baxley*, 94–2982 (La. 5/22/95), 656 So.2d 973; *Williams*; *State v. Batiste*, 2006–0875 (La. App. 4 Cir. 12/20/06), 947 So.2d 810. This Court in *Batiste*, at p. 18, 947 So.2d at 820 further explained:

> An appellate court reviewing a claim of excessive sentence must determine whether the trial court adequately complied with the statutory guidelines in La. C.Cr.P. art. 894.1, as well as whether the facts of the case warrant the sentence imposed. *State v. Landry*, *supra* [871 So.2d 1235 (La. App. 4 Cir. 2004) ]; *State v. Trepagnier*, 97–2427 (La. App. 4 Cir. 9/15/99), 744 So.2d 181. However, as noted in *State v. Major*, 96–1214, p. 10 (La. App. 4 Cir. 3/4/98), 708 So.2d 813:

> > The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. *State v. Lanclos*, 419 So.2d 475 (La. 1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence

imposed. La. C.Cr.P. art. 881.4(D).

> If the reviewing court finds adequate compliance with art. 894.1, it must then determine whether the sentence the trial court imposed is too severe in light of the particular defendant as well as the circumstances of the case, "keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged." *State v. Landry*, 2003–1671 at p. 8, 871 So.2d at 1239. *See also State v. Bonicard*, 98–0665 (La. App. 4 Cir. 8/4/99), 752 So.2d 184.

Here, before imposing sentence on the multiple bill, the court first noted that it had obtained a presentence investigation report. It stated that it had given several reasons for imposing the original sentence, and it then reiterated these reasons. The court listed Tyrone Bienemy's prior convictions and juvenile adjudications. It noted that his criminal history began when he was twelve years old, and he had delinquency adjudications in 1998 for unauthorized use of a movable and in 2001 for carrying a concealed weapon. The court then listed his adult convictions: theft of goods from Jefferson Parish in 2001 for which he received probation; unauthorized use of a movable from DeSoto Parish in 2005 for which he received probation; illegal carrying of a weapon in Orleans Parish in 2006 for which he received probation; possession of marijuana, first offense in Orleans Parish in 2008 for which he received probation; possession of marijuana, third offense in Jefferson Parish in 2008 for which he received probation; and another conviction for simple possession of marijuana in Orleans Parish in 2009 for which he was sentenced to serve twenty-five days in parish prison. The court noted that the jury unanimously convicted him of manslaughter, but the court felt that the evidence proved that he committed second degree murder as charged.

The court looked to the factors of art. 894.1 and found that none of the mitigating factors applied to Tyrone Bienemy's case. The court noted that Tyrone Bienemy's criminal history showed an escalation of violence. The court then listed the aggravating factors that applied: he exhibited "deliberate cruelty" to children and older adults, even to the point where the victim's mother felt it necessary to jump from a second floor window with her grandchild to escape Tyrone Bienemy; he created a risk of harm to more than one person; he exhibited threats of violence and actual violence to the victim's family; and he used a dangerous weapon. Finding that any lesser sentence would deprecate the seriousness of the offense, the court vacated the previous sentence of forty years and imposed the maximum sentence of eighty years at

hard labor. Counsel objected to the sentence.

Thus, the court adequately complied with art. 894.1. Moreover, a comparison of the facts of this case with similar cases shows that the court did not abuse its discretion by imposing the maximum sentence. For example, in *State v. Kelson*, 2009–0204 (La. App. 4 Cir. 6/9/10), 40 So.3d 194, the defendant and a companion viciously beat and stomped the victim, and then left him to die in a dumpster. The court also noted that the defendant had prior convictions.

Likewise, in *State v. Walker*, 99–2868 (La. App. 4 Cir. 10/18/00), 772 So.2d 218, this Court upheld an eighty-year sentence imposed for a conviction for manslaughter as a second offender. The defendant, charged with second degree murder, was convicted of manslaughter. He had confessed to strangling a woman who began hitting and pushing him after they had smoked crack cocaine and had sex, when he told her that he had no more money or crack cocaine. Although he had only one prior conviction for theft valued at more than five hundred dollars, he had a lengthy history of arrests, including seven prior arrests (but no convictions) for aggravated and/or assault offenses. In addition, family members indicated that he was capable of inflicting bodily harm, including a report by his sister that he had a tendency to fight women, and that he had confessed to her that he had killed his own grandmother.

Tyrone Bienemy insists, however, that his sentence is excessive, and he cites two cases where a defendant convicted of manslaughter received drastically lesser sentences. However, in each of these cases, the defendant was sentenced as a first offender, rather than as a second offender as the court adjudicated Tyrone Bienemy. In *State v. Brown*, 35,641 (La. App. 2 Cir. 8/20/03), 852 So.2d 1234, the defendant smoked cocaine with the victim in a secluded area and then beat, strangled, and drowned her. He had prior convictions for forgery, carnal knowledge of a juvenile, simple battery, and conspiracy to distribute cocaine and marijuana. The appellate court rejected his claim that his twenty-year sentence as a first offender was excessive. Likewise, in *State v. Taylor*, 35,921 (La. App. 2 Cir. 4/3/02), 813 So.2d 1151, the defendant shot the victim twice after having sex with him when the victim indicated that he wanted to have more sex. The defendant was seventeen at the time of the offense and had some criminal history. The appellate court found that his twenty-two-year sentence as a first offender was not excessive. In each of these cases, the court found that the sentence imposed was not excessive; in neither case did it find that any greater sentence would be excessive.

Here, unlike in the cases cited above, the court adjudicated Tyrone Bienemy a
second offender and imposed sentence in accordance with that adjudication.
Although his sentence is much greater than those affirmed in *Brown* and
*Taylor*, the defendants in those cases were sentenced as first offenders. Given
the maximum sentences upheld by this Court in *Walker* and *Kelson*, it does not
appear that the trial court abused its discretion by imposing the maximum
sentence of eighty years as a second offender. It must be noted that the
standard of review is not whether this Court might think that another sentence
would be more suitable; the standard is whether the trial court abused its
discretion in imposing the sentence that it imposed. Applying *Walker* and
*Kelson*, we find that the trial court did not abused its discretion in this case.
This assignment has no merit.[18]

The Louisiana Supreme Court denied Bienemy's related writ application without assigning

additional reasons.

To the extent, if any, Bienemy suggests that the state trial court failed to comply with

state sentencing rules, he has not stated a cognizable federal *habeas corpus* claim.    *See*, *e.g.*,

*Butler v. Cain*, 327 F. App'x 455, 457 (5th Cir. 2009) (claim that sentence violated state law

is not cognizable in federal *habeas* proceeding.); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir.

1987) ("... a state's failure to follow its own sentencing procedures is not reviewable by

federal habeas corpus").    Federal *habeas corpus* relief is available to correct violations of

federal constitutional law, not errors of state law.    *Narvaiz v. Johnson*, 134 F.3d 688, 695

(5th Cir. 1998).    Accordingly, this Court cannot review a claim challenging the legality of a

sentence under state law.

To the extent he contends that his sentence constitutes cruel and unusual punishment

---

[18]    *Bienemy*, 116 So.3d at 793-795 (citation omitted).

under the Eighth Amendment, federal *habeas* review is available; however, that claim fails on the merits.    Bienemy argues that while the jury rejected the charge of second-degree murder which carried a life sentence, the maximum 80-year sentence for manslaughter has the same effect as life imprisonment and was not warranted because he did not physically hurt any family members of the victim and had no criminal history of violence against persons.

A state-court decision is "contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."    *Williams v. Taylor*, 529 U.S. at 405-406; *see also Bell v. Cone,* 535 U.S. at 694.    The Eighth Amendment prohibits sentences that are grossly disproportionate to the crime committed.    *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003) (rejecting a proportionality challenge where the defendant was sentenced to two consecutive terms of 25 years to life for two felony counts of petty theft for stealing $150.00 worth of videotapes); *Solem v. Helm*, 463 U.S. 277, 291-92 (1983) (holding that the Eighth Amendment prohibited a life sentence without the possibility of parole for a recidivist offender convicted of "uttering a 'no account' check for $100"); *Rummel v. Estelle*, 445 U.S. 263 (1980) (rejecting a proportionality challenge where the defendant, who had three prior non-violent felony offenses, had been sentenced to life imprisonment under a recidivist statute following his conviction for obtaining $120.75 by false pretenses); *see also*

*McGruder v. Puckett*, 954 F.2d 313, 315 (5th Cir. 1992).    As the Supreme Court recognized in *Lockyer*, "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case."    *Lockyer*, 538 U.S. at 72-73 (citing *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (rejecting a proportionality challenge for sentence of life in prison without parole for the possession of more than 650 grams of cocaine)).

In determining whether or not a sentence is greatly disproportionate, the Fifth Circuit framework dictates that courts first "makes a threshold comparison of the gravity of the offense against the severity of the sentence."    *McGruder v. Puckett*, 954 F.2d at 316.    "Only if we infer that the sentence is grossly disproportionate to the offense will we then...[] compare the sentence received to (1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions."    *Id.*    If the sentence is not "grossly disproportionate" in the first instance, however, the inquiry is finished.    *Harmelin*, 501 U.S. at 1005 ("[I]ntrajurisdictional and interjursdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality."); *United States v. Gonzales*, 121 F.3d 928, 942 (5th Cir. 1997), *overruled on other grounds by United States v. O'Brien*, 560 U.S. 218, 130 S.Ct. 2169, 176 L.Ed.2d 979 (2010)).    The Fifth Circuit applies this framework using *Rummel* as "a benchmark for claims of disproportionate punishment under the Eighth

Amendment."    *Id*. at 943.

Bienemy's situation is not an extraordinary case where the sentence is unconstitutionally disproportionate to the crime.    He was charged with second-degree murder, convicted of manslaughter and adjudicated a second-felony offender.    His 80-year sentence, albeit the maximum allowed, falls within the limits set by the Louisiana legislature for a second-felony offender under Louisiana Revised Statute 15:529.1.    Furthermore, when evaluating the excessiveness of a sentence imposed under a habitual offender statute, a court must be mindful that the "sentence is imposed to reflect the seriousness of [petitioner's] most recent offense, not as it stands alone, but in the light of his prior offenses." *McGruder v. Puckett*, 954 F.2d at 316.    Here, Bienemy's sentence reflected not only the seriousness of the charged offense, *i.e.*, second-degree murder, but also his significant prior criminal conduct.    As previously noted, the Louisiana Fourth Circuit Court of Appeal highlighted factors that sufficiently explained why his sentence of 80 years was proportionate and warranted for this crime:

> The court looked to the factors of art. 894.1 and found that none of the mitigating factors applied to Tyrone Bienemy's case. The court noted that Tyrone Bienemy's criminal history showed an escalation of violence. The court then listed the aggravating factors that applied: he exhibited "deliberate cruelty" to children and older adults, even to the point where the victim's mother felt it necessary to jump from a second floor window with her grandchild to escape Tyrone Bienemy; he created a risk of harm to more than one person; he exhibited threats of violence and actual violence to the victim's family; and he used a dangerous weapon. Finding that any lesser sentence would deprecate the seriousness of the offense, the court vacated the previous sentence of forty years and imposed the maximum sentence of eighty years at hard labor.

Thus, given the violent nature of the instant crime and his extensive criminal history, this case simply does not qualify as a rare situation in which the difference between the crime and the sentence was unconstitutionally disproportionate.

Accordingly, Bienemy fails to demonstrate that the adjudication of his excessive-sentence claim was contrary to or involved an unreasonable application of clearly established Supreme Court law.    He is not entitled to relief on this claim.

    *C.  Prosecutorial Misconduct*

Bienemy claims that the prosecutor engaged in misconduct during his closing argument by impugning defense counsel's integrity and attempting to shift the burden of proof to the defense.    In particular, Bienemy points to remarks made about his defense attorney lying on his client's behalf because it was his job to do so.    He also mentions comments the prosecutor made about Bienemy smirking during trial, his guilty act of fleeing the state after the incident and poor police investigation to elicit sympathy from the jury. Bienemy maintains that these improper remarks coupled with the State's withholding of material evidence until the start of trial and taking evidence from the courtroom at one point during trial denied him due process and a fair trial.

Closing argument was not transcribed in its entirety; however, the alleged objectionable remarks and the corresponding objections made during closing argument were transcribed and made a part of the record.    They are reproduced here in relevant part:

MR. PIPES (State Prosecutor):

> *I was struck by Mr. Williams talking about lies and accusing the State of lying, accusing me of lying, Mr. Myers of lying.    Let's talk about lies for a second, Mr. Williams.*

\*          \*          \*          \*

MR. PIPES:

> And Mr. Williams said, is she lying for another reason? What? What was that reason? What evidence has come forth to say she was lying for someone? None.

> And she was smiling? Tyrone Bienemy has been smirking through this whole trial.

MR. WILLIAMS (Defense Counsel for Bienemy):

> Objection, Judge.

MR. PIPES:

> You saw it.

THE COURT:

> Overruled.

MR. PIPES:

> Because he knows he got one of the best attorneys in this state –

MR. WILLIAMS:

> Objection.

MR. COUTURE (Defense Counsel for Veal):

> Objection

MR. PIPES:

--lying for him to get him off.

THE COURT:

Sustained.

MR. WILLIAMS:

I ask that you admonish the State, Judge.

THE COURT:

Ladies and Gentlemen, this is argument. Again, it's not to be considered as evidence in this case.

Let's not direct comments at counsel.

MR. PIPES:

They once again say, where are the cell phone records in this digital age? They don't want the cell phone records. They want the lack of cell phone records. Because don't you think if those cell phone records wouldn't show it, they'd produce them for you?

MR. WILLIAMS:

Objection, Judge.

MR. COUTURE:

Objection.

MR. WILLIAMS:

Shifting the burden.

THE COURT:

Overruled.

MR. WILLIAMS:

He's shifting the burden.

MR. MYERS:

Mr. Williams, please sit down.

THE COURT:

Mr. Meyers.

MR. WILLIAMS:

Move for mistrial, Judge.

MR. COUTURE:

Motion for mistrial.

THE COURT:

Mistrial denied.

*    *    *    *

MR. PIPES:

He would like you to believe that Tyrone Bienemy didn't go see Orlando Matthews because he was worried about his marijuana probation getting revoked.    He fled the state to Texas because he was worried about his marijuana probation, because a police officer called and had questions for him. Does that make sense to any of you?

You flee the state because you get a call from the police while you're on probation? No. You flee the state because you killed someone and you're in a panic.    You're doing whatever you can to get away.    There are a lot of murderers who don't go to jail because defense attorneys lie and juries look

the other way.

Why do people lie, he said?    Lots of reasons. But the one he skipped is that some people lie because it's their job.    It's his job to make sure Tyrone Bienemy goes home.

MR. WILLIAMS:

Objection.

THE COURT:

Overruled.

MR. PIPES:

That's what he's here to do.    He's not here to pump up the truth.    He's not here to solve the case.    He will say and do anything –

MR. WILLIAMS:

Objection. Am I on trial?

THE COURT:

Overruled.

*    *    *    *

MR. PIPES:

And I wish that the family of the victim could take solace that they had the best police work, that they had a detective here who'd care for them. They don't.

What they have, however, is the truth. Not doubt. Not questions. Not lies. Those are the tools of the defense.

Ladies and gentlemen –

MR. WILLIAMS:

Objection, your Honor. –

THE COURT:

Sustained.

MR. PIPES:

Ms. Croft let those two men –

MR. WILLIAMS:

Ask for an admonishment of the State, Judge.

THE COURT:

Ladies and Gentlemen, again, this is argument.    You can continue, Mr. Pipes.[19]

Bienemy raised his prosecutorial misconduct claim by application for post-conviction relief.    The claim was summarily rejected by the state courts.    The state court's decision was neither contrary to Supreme Court precedent nor an unreasonable application of federal law.

A prosecutor's comment does not present a claim of constitutional magnitude in a federal *habeas* action unless it is so prejudicial that the trial was rendered fundamentally unfair in violation of the Due Process Clause.    *Jones v. Butler*, 864 F.2d 348, 356 (5th Cir. 1988).    "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned.    The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations and quotations omitted); *accord*

---

[19]    State Rec., Vol. 5 of 7, Trial Transcript pp. 542-553.

*Rogers v. Lynaugh*, 848 F.2d 606, 608 (5th Cir. 1988); *Bell v. Lynaugh*, 828 F.2d 1085, 1095 (5th Cir. 1987).

The prosecutor's remarks must be evaluated in the context of the entire trial. *Greer v. Miller*, 483 U.S. 756, 765–66 (1987) (citing *Darden*, 477 U.S. at 179); *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985). Ultimately, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Mindful of this focus, the Court observes that each comment must be viewed not in a vacuum, but in the context of trial as a whole so as to ensure fundamental fairness.

1. Attacking the integrity of defense counsel

Bienemy argues that the state prosecutor improperly accused defense counsel of lying to the jury. The record shows that the state prosecutor lodged no specific objections during the defense's closing argument when Williams referred to the State lying, but he did respond with vigor to Williams's attack on the integrity of the state prosecutors during his own closing argument. The prosecutor's comments directed at Williams were ill-advised, even if they were arguably provoked. The trial court acknowledged as much when it sustained defense counsel's objection and cautioned the prosecutor to refrain from directing comments at counsel. Clearly, prosecutors should refrain from gratuitously attacking a defendant's choice of counsel or defense counsel's integrity and veracity. *See, e.g., Bruno v. Rushen*, 721 F.2d 1193, 1195 (9th Cir. 1983) (holding pre-*Darden* that prosecutor's

comments equating defendant's hiring of counsel with guilt and comments attacking integrity of defense counsel without evidence were improper and error of constitutional dimension).    However, the Supreme Court has made it clear that such comments do not rise to the level of constitutional error unless prejudicial to the point of denying the defendant a fundamentally fair trial.    *See Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 2153, 183 L.Ed.2d 32 (2012) (citing *Darden*, 477 U.S. at 181); *see also Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002).    That did not occur in this case.

The State's remarks were made in the context that followed immediately after defense counsel accused the attorneys for the State of lying.    Moreover, jurors were properly warned to disregard the comments directed at defense counsel.    At defense counsel's request, the court specifically admonished jurors twice, in fact, contemporaneously with the objectionable comments directed at defense counsel personally, and the defense generally, not to consider the prosecutor's argument as evidence in the case.    When a curative instruction is issued, a court presumes that the jury has disregarded improper evidence and that no due-process violation occurred.    *See Greer v. Miller*, 483 U.S. at 766 n. 8; *Darden*, 477 U.S. at 182 (the Court condemned egregious, inflammatory comments by the prosecutor but held that the trial was fair since curative actions were taken by the trial judge).

Furthermore, the evidence against Bienemy was significant.    Although he claims the evidence against him was "insubstantial," that assertion is simply untrue.    Several

eyewitnesses identified Bienemy as one of the gunmen and Bienemy's co-perpetrator, Croft, testified that she executed the plan to let both Veal and Bienemy into the house to rob the victim and that she saw Bienemy shoot the victim.    The jury was able to view and weigh that evidence independently and fairly and render a verdict finding him guilty of manslaughter rather than second-degree murder.    Clearly, the strength of the evidence against him, not the brief comment on defense counsel's integrity (which the jury was adequately warned to disregard) led to his conviction.    *See Norris v. Davis*, 826 F.3d 821, 831 (5th Cir. 2016) (holding that the prosecutor's comments in context—and in light of the trial judge's limiting instructions, the length of the trial, and the overwhelming evidence of Norris's guilt—cannot be said to have "so infected the trial with unfairness as to make the resulting conviction a denial of due process.") (citing *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)).

 2. <u>Attempt to shift the burden of proof</u>

  Bienemy argues generally that the State improperly attempted to shift the burden of proof to the defense.    He does not cite to any particular part of the record to support his assertion.    However, at one point during closing argument, the state prosecutor commented about the absence of phone records and defense counsel objected on grounds that it was an attempt to shift the burden of proof.    Presumably, Bienemy's assertion is based upon this remark.    The record shows that defense counsel's objection was overruled and his related motion for mistrial was denied by the trial court.    The remark actually appears to be a responsive argument directed to the defense's argument about the State's

failure to produce evidence, *i.e.*, "*They once again say*, where are the cell phone records in this digital age? They don't want the cell phone records. They want the lack of cell phone records. Because don't you think if those cell phone records wouldn't show it, they'd produce them for you?"    As such, the prosecution comment is not an attempt to shift the burden of proof to the defense.    Furthermore, even if the comment was improper, it was hardly "so pronounced and persistent that it permeates the entire atmosphere of the trial" to mandate reversal.    *See, e.g., United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992).    Unlike *Simon*, where the prosecutor repeatedly referred to the defendant's failure to produce a .45 caliber gun matching the murder weapon for inspection, the prosecutor's comment cited above is a single, brief and isolated comment made in closing.    Considering the nature of this comment in the context of the entire trial, it clearly did not infect the entire trial with error that deprived Bienemy of a fundamentally fair trial.    *See Simon*, 964 F.2d at 1086.

   3.   <u>Statements implying guilt and invoking sympathy</u>

   Bienemy claims that the prosecutor improperly informed jurors he likely fled the state because he was guilty.    In no way did this comment suggest that the State had additional knowledge or information about the case which had not been disclosed to the jury. *See, e.g., United States v. Munoz*, 150 F.3d 401, 414 (5th Cir. 1998); *Nichols v. Scott*, 69 F.3d 1255, 1282–83 (5th Cir. 1995) (comments are not improper where it is apparent to the jury that the comments are based on the evidence presented at trial rather than on personal knowledge of facts outside the record).    Indeed, pursuant to Louisiana Code of Criminal

Procedure article 774, the prosecutor's quoted arguments were "confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state ... may draw therefrom, and to the law applicable to the case."    The prosecution's comment that Bienemy may have fled because he was guilty of a crime was a reasonable alternate inference from the evidence adduced at trial and therefore was not improper.

Furthermore, the prosecutor's relatively insignificant observations regarding Bienemy's facial expression during trial or the absence of support from police for the family of the victim cannot be considered misconduct rising to the level of a due-process violation. These remarks were hardly persistent or pronounced enough to amount to a due-process violation.    Furthermore, to the extent that any of the remarks were prejudicial, the prejudicial effect of the prosecutor's remarks were mitigated by the trial judge's repeated cautionary instructions that counsels' arguments in closing were not to be considered as evidence.    Bienemy cannot show that absent the relatively insignificant comments there would have been a reasonable probability that the verdict might have been different.

Accordingly, viewing the objectionable remarks in the proper context of the entire evidentiary record and trial as a whole, it cannot be concluded that the conviction would not have occurred but for the prosecutor's comments or that the trial was rendered fundamentally unfair.

    4.   Withholding Exculpatory Evidence

Bienemy argues that the State withheld exculpatory evidence of videotape recordings until after the start of trial in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).    He claims that the tapes contained "information that would have shown the inconsistencies in the testimony of the witnesses and exculpatory information that would have shown that Bienemy was not the perpetrator."[20]    The State argues that Bienemy's conclusory allegations fail to prove that a discovery violation, much less a *Brady* violation, even occurred or that he suffered any prejudice from the delayed disclosure.

The claim was raised as part of Bienemy's prosecutorial-misconduct claim in his application for post-conviction relief, which the state courts summarily denied.    This Court must determine whether that state-court decision denying the claim on post-conviction "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."    28 U.S.C. § 2254(d)(1).    For the following reasons, the undersigned finds that it was not an unreasonable application of controlling Supreme Court precedent.

The record confirms that the State disclosed additional discovery to the defense on the first morning of trial.    The supplemental discovery consisted of an interview with a minor witness, Lavante Riley, at the Child Advocacy Center relative to the instant criminal case and lengthy interviews police conducted with Chelsea Croft relative to a different criminal investigation in Opelousas, also involving the victim.    After being provided with

---

[20]   Rec. Doc. 4-1, p. 33.

the tapes, defense counsel moved for a mistrial arguing that the late disclosure prevented them from effectively using the evidence to impeach the testimony of the State's key witness, Chelsea Croft.    The defense argued that Riley was unable to identify Veal and also that his statement contradicted Croft's testimony with regard to the second perpetrator, purportedly Veal, coming upstairs.[21]    The defense maintained that Croft's interview was material because she implicated the victim as being involved in a fraudulent-check scheme, and her statements suggested that other persons (besides Veal and Bienemy) had motive and a desire to kill the victim because of the bad checks.

The trial court denied the defense motion for a mistrial finding that the taped interview with Riley was made known to the defense because it was cited in the supplemental police report that was part of the State's original discovery disclosure, and ruled that the State would be allowed to introduce the Riley tape.    The trial court also found that the State did not intentionally suppress the Croft videotapes, but was unaware of their existence.    The prosecutor explained that he disclosed them to the defense immediately when he realized they were in the State's file materials.    Defense counsel had an opportunity to view the tapes before trial continued.    The trial court denied a request to stay the proceedings, but did recess early on the second day of trial to allow the defense more

---

[21]    Keith Couture, counsel for Veal, advanced this argument at trial.    State Rec., Vol. 4 of 7, Trial Transcript, pp. 31-32.    The argument was adopted and made by counsel for Bienemy in his emergency writ application from the denial of the motion for mistrial.    *See* State Rec., Vol. 1 of 7, Louisiana Fourth Circuit Writ Application No. 2011-K-0378.

time to prepare in light of the recently supplied tape recordings.[22]    Defense counsel filed an

emergency writ application with the court of appeal, but relief was denied.[23]

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused

upon request violates due process where the evidence is material either to guilt or to

punishment, irrespective of the good faith or bad faith of the prosecution."    *Brady v.*

*Maryland*, 373 U.S. 83, 87 (1963).    The prosecutor's duty to provide favorable evidence

includes impeachment evidence and exculpatory evidence.    *United States v. Bagley*, 473 U.S.

667, 676 (1985).    The videotaped statements in the instant case cannot be considered

"suppressed" in violation of *Brady* because they were produced during trial in sufficient time

for defense counsel to put it to effective use.    *See, e.g., Lawrence v. Lensing*, 42 F.3d 255, 257

(5th Cir. 1994); *United States v. McKinney*, 758 F.2d 1036, 1049-50 (5th Cir. 1985); *Smith v.*

*Travis*, Civ. Action No. 08-4627, 2009 WL 1704335, at *10 (E.D. La. June 16, 2009); *Stogner*

*v. Cain*, Civ. Action No. 05-4317, 2008 WL 269078, at *20 (E.D. La. Jan. 30, 2008); *Baker v.*

*Cain*, Civ. Action No. 05-3772, 2007 WL 1240203, at *5 (E.D. La. Apr. 26, 2007).    The Riley

and Croft interviews were disclosed by the State at the start of trial with enough time for

defense counsel to review the videotapes and use any exculpatory and impeachment

---

[22]    *See* State Rec., Vol. 4 of 7, Trial Transcript, pp. 55-59; *see also* State Rec., Vol. 2 of 7, Trial Court's *Per Curiam* of March 22, 2011 (memorializing the early recess); State Rec., Vol. 2 of 7, State's Supplemental Inventory of Discovery and Original Inventory of Discovery; *see also* State's Compliance with Court Order and Disclosure dated March 23, 2011.

[23]    State Rec., Vol. 1 of 7, *State v. Bienemy*, 2011-K-0378 (La. App. 4 Cir. March 22, 2011).

information discovered at trial.[24]   Furthermore, the impeachment evidence at issue did not contradict Croft's testimony that she witnessed Bienemy shoot the victim.   The record does not demonstrate that Bienemy was denied a fair trial due to the delayed disclosure of the videotaped interviews.

5.   Removal of Evidence from Courtroom

Bienemy alleges that the prosecutor took evidence out of court to show a witness before testifying.   He cites to the page in the transcript where this incident occurred, but offers no argument on the issue.[25]   A review of the record reflects that the incident occurred on the third day of trial.   Defense counsel objected and moved for a mistrial when he learned that the prosecutor had removed a piece of evidence from the courtroom.   The State prosecutor acknowledged that he left the courtroom with a piece of evidence that had been identified and marked, but not officially entered into evidence, with the intention of showing it to his next witness "merely in order to move the case along."   However, he confirmed that defense counsel prevented him from doing so, and he returned to the courtroom with the evidence still in the bag.   The trial court denied the motion for mistrial. Bienemy does not explain how the actions of the prosecutor by simply walking outside of the

[24]   *See generally*, State Rec., Vol. 5 of 7, Trial Transcript (Day 4-March 24, 2011), pp. 429-451 (Lavonte Riley) and pp. 468-508 (Chelsea Croft).

[25]   Rec. Doc. 4-1, p. 31; State Rec., Vol. 4 of 7, pp. 228-230.

courtroom with evidence and then promptly returning it can be considered prosecutorial misconduct rising to the level of denying him due process and a fair trial.

For the reasons expressed, none of the alleged incidents cited by Bienemy constituted prosecutorial misconduct so as to deny him due process or a fundamentally fair trial. Accordingly, the state court's determination on the prosecutorial misconduct claim was not an unreasonable application of Supreme Court precedent. Bienemy is not entitled to federal *habeas* relief on this claim.

D.   *Trial-Court Error Involving the Jury*

Bienemy claims that he was denied his constitutional rights under the Fifth, Sixth and Fourteenth Amendments when the trial court continued with trial in the absence of all jurors, failed to question two jurors who expressed concerns about continuing with jury service and allowed them to remain on the jury, and failed to give jury instructions or explain the elements of the offense or responsive verdicts. The state courts considered and summarily rejected these claims on post-conviction review.

1.   Missing Jurors

Bienemy claims that the trial court failed to ensure that all jurors were present during the critical stages of trial in violation of his constitutional rights. He cites 11 instances generally, by reference to pages in the transcript, to support his claim that "on numerous occasions jurors were brought from the courtroom and returned without consideration as to whether every juror was present for trial. Many of the numerous times this happened

was during critical parts of the trial and it cannot be assessed which parts each juror heard or was absent from."[26]    He cites to one page in the transcript, in particular, where he claims "the clerk recorded such absence," and yet the court continued with trial.    The transcript reads, in relevant part:

THE COURT:

Let the record reflect the jury is back in court.    The defendants are present with – no, we don't have all of our jurors.    Thank you, Mr. Couture.    I was missing that seat.[27]

As the State correctly notes, an exhaustive review of the pages cited by Bienemy reveals no support for his claim that *any* portion of the trial proceedings was conducted without all jurors present.    At no point during trial did counsel for the State or the defense object to missing jurors.    Even the above-cited portion fails to prove that jurors were missing during critical portions of trial.    Instead, it demonstrates that the trial court properly sought to account for the presence of all jurors upon returning to the courtroom.    This claim is unfounded and meritless.

2.  Juror Misconduct

Bienemy next claims that the trial court violated his right to a fair trial by failing to fully investigate the claims of potential juror misconduct raised by defense counsel and to rehabilitate two jurors who "may have conferred about the trial."    In particular, he argues

---

[26]  Rec. Doc. 4-1, pp. 35-36.

[27]  State Rec., Vol. 4 of 7, p. 131.

that the trial court "failed in [its] duty to have the jurors brought back and questioned as requested by counsel and simply had each of the jurors return for deliberations without being questioned as to whether they had been discussing the case amongst themselves outside the presence of other jurors or alone with some of the jurors in the jury room."[28] The State contends the record does not show that any alleged misconduct ever took place. The state courts summarily rejected the claim on post-conviction review.

The Sixth Amendment right to a fair trial includes the right to an impartial jury. *Miniel v. Cockrell*, 339 F.3d 331, 338 (5th Cir. 2003) (citing *Morgan v. Illinois*, 504 U.S. 719, 727, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)); *see also Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "The constitutional standard for juror impartiality requires that an individual juror be able to "lay aside his ... opinion and render a verdict based on the evidence presented in court." *See Irvin v. Dowd*, 366 U.S. at 723.    Here, the evidence established that the trial confirmed the two jurors at issue could perform their duties as jurors impartially before allowing them to continue serving on the jury.

Near the end of trial, two jurors approached the trial judge independently with personal concerns about serving on the jury.    In chambers with the attorneys present, Juror No. 12 explained that she was having difficulty with the notion that a guilty verdict could mean life in prison for the two young men.    She expressed that she was one of the

---

[28]  Rec. Doc. 4-1, p. 37.

young jurors and could not see herself "putting away two young guys like that."[29]    Juror No. 4 separately informed the trial judge that he was uncomfortable because he saw familiar faces in the courtroom and he feared possible retaliation or endangering his family.[30]    He also expressed that he was one of the younger jury members and "just not comfortable making the final decision."    Defense counsel moved for a mistrial arguing that their similar comments about their youth suggested that they had discussed the matter with and been improperly influenced by another member of the jury.    The trial court rejected any such notion about pressure from others as sheer speculation, engaged in discussion with each of the jurors,[31] and ensured by their responses that they still would be able to render a fair and impartial verdict based on the evidence presented.    The trial court denied the defense motion for a mistrial.    The jury deliberated and returned a unanimous verdict finding the defendants guilty of manslaughter.

Bienemy's unsubstantiated assertions of juror misconduct provide no grounds for federal *habeas* relief.    As his defense counsel unsuccessfully argued at trial, Bienemy alleges that there must have been discussion among the jurors because both jurors mentioned that they were younger members of the jury.    This conveniently ignores that the actual grounds for their asserted difficulty was distinct, *i.e.*, youth of the offenders and

---

[29]  State Rec., Vol. 5 of 7, pp. 514-515.

[30]  State Rec., Vol. 5 of 7, p. 518.

[31]  State Rec., Vol. 5 of 7, Trial Transcript, pp. 518-520, 534-537.

severity of sentence versus fearing personal retaliation.    Furthermore, mere speculation will not suffice to establish that actual prejudicial juror misconduct occurred and prevented him from receiving a fair trial.    Speculative, conclusory and unsupported allegations are insufficient to raise a constitutional issue in a *habeas* proceeding.    *United States v. Woods*, 870 F.2d 285, 288 n. 3 (5th Cir. 1989) (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) ("Although *pro se* habeas petitions must be construed liberally, mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue.")); *United States v. Pineda*, 988 F.2d 22, 23 (5th Cir. 1993) (same); *Beazley v. Johnson*, 242 F.3d 248, 270 (5th Cir. 2001) ("conclusory allegations are insufficient to raise a constitutional issue").

Contrary to Bienemy's assertion, there is no evidence in the record to indicate that either juror succumbed to improper influences or pressures exerted by the other or someone else on the jury.    Rather, the jurors appeared to struggle with their own internal emotions as they both candidly expressed to the trial judge when deliberations neared.    The record shows that the trial court questioned each juror separately about his or her individual concerns.    While the jurors undoubtedly found the situation difficult, perhaps because of their youth, they nonetheless stated to the trial court that they would still be able to perform the duties of a juror and render a fair and impartial verdict in the case.    The trial judge found each juror credible in stating that they could perform their duties properly and fairly, and that finding is entitled to deference on federal *habeas* review.    "[S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within the trial

judge's province." *Wainwright v. Witt*, 469 U.S. 412, 428 (1985).    "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007).    Where federal courts do not accord this deference, they "fail[ ] to respect the limited role of federal habeas relief in this area prescribed by Congress and by [the Supreme Court's] cases." *Id.* at 10; *accord Fuller v. Johnson*, 114 F.3d 491, 500-01 (5th Cir. 1997).

Accordingly, the Court finds that the state court's denial of relief on this claim was not contrary to, or an unreasonable application of, federal law.    Bienemy is not entitled to *habeas* relief on this claim.

### 3. Jury Instructions

In his third sub-claim, Bienemy asserts that the trial court neglected to provide the jury with instructions.    He alleges that "the court failed to even read the instruction to the jury but left each juror to its own interpretation of the complicated instructions given, allowing them to proceed into the jury room with the instruction so that each may independently interpret the charge, elements and responsive verdicts."[32]    As the State correctly points out, that allegation is directly contradicted by the state-court record. Bienemy's argument presumably is based on the fact that the jury instructions were neither transcribed nor made a part of the state court record.    Nonetheless, a review of the court

---

[32]  Rec. Doc. 4-1, p. 38.

reporter's parenthetical notes in the transcription following closing argument detail very clearly:    ("*The Court charges the jury*. There is a bench conference during the jury charge before the flight instruction."). The transcript reflects that the trial court then explains to the jury in detail the nuances of reaching a verdict and completing the verdict sheets. Following that explanation, the trial court informs the jury, "Ladies and Gentlemen, these are complicated and lengthy instructions.    If you need me to *reread* any or all of them, please do not hesitate to let Deputy O'Neal know, and I'll bring you down and instruct you on the law *again*, any portion of the law or all of it." (emphasis added).    Subsequently, another parenthetical entry memorializes: ("No objections to the jury instructions are noted by the defense.").[33]    Although Bienemy suggests that the trial court failed to charge the jury regarding the testimony of an accomplice, the record demonstrates that no such objection was made by the defense when the jury instructions were given.

A *habeas* petitioner has the burden of proving facts in support of his claim. Unsupported conclusory allegations do not warrant *habeas* relief.    *Uresti v. Lynaugh*, 821 F.2d 1099, 1102 (5th Cir. 1987); *Wilson v. Butler*, 813 F.2d 664, 671 (5th Cir.), *on reh'g*, 825 F.2d 879, 881 (5th Cir. 1987), *cert. denied*, 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988).    Here, Bienemy's argument that the trial judge failed to give the jury appropriate instructions is not only entirely unsupported, but also factually erroneous.    This claim lacks merit.

---

[33]    State Rec., Vol. 5 of 7, pp. 553-555.

Accordingly, Bienemy has not shown that the state court's determination of his alleged trial-court error claims associated with jury matters was either contrary to or an unreasonable application of federal law.    He is not entitled to relief on these claims.

E.  *Ineffective Assistance of Trial and Appellate Counsel/Denial of Right to Appellate Review*

In a related argument, Bienemy claims that trial counsel was ineffective for failing to object when the trial court allegedly neglected to provide jury instructions.    He also faults appellate counsel for failing to consult with him and raise several claims on direct appeal. He claims that he was effectively denied appellate review because relevant portions of the trial proceedings were not recorded.

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel.    Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense.    *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."    *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e*, deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.    *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.     *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998).     Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689.     "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"     *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690).     A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.     *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."     *Strickland*, 466 U.S. at 694.     In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.

Because the state courts rejected Bienemy's ineffective-assistance-of-counsel claims

on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state-court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."    28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). In fact, the United States Supreme Court has held that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims must be "doubly deferential" in order to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. at 190).

1.  <u>Trial Counsel</u>

As discussed above, the record does not support Bienemy's assertion that the trial court failed to provide jury instructions.    In fact, the record disproves his argument. Therefore, trial counsel cannot be held responsible for not lodging an objection when there is absolutely no proof that the complained of error occurred.    Counsel does not render constitutionally ineffective assistance by failing to raise a meritless objection.    *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (citing *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions or objections."); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994).    On the record presented, the claim is baseless.    Thus, Bienemy cannot show that counsel's failure to object constituted deficient performance or that the omission prejudiced the defense's case. Accordingly, his claim that trial counsel was ineffective does not merit *habeas* relief.

2. Appellate Counsel

Bienemy next claims that appellate counsel should have conferred with him so she could have raised claims of error regarding the missing portions of the trial record, the trial court's omitted jury instructions, trial counsel's ineffective assistance for failing to object to the lack of jury instructions, the trial court's failure to admonish the jury during closing when the prosecutor made improper remarks, and the State's suppression of evidence under *Brady*.

The *Strickland* standard also applies to claims of ineffective assistance of appellate counsel.   *Duhamel v. Collins,* 955 F.2d 962, 967 (5th Cir. 1992) (citing *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991)).    In reviewing claims of ineffective assistance of appellate counsel, the Supreme Court of the United States has expressly observed that appellate counsel "need not advance *every* argument, regardless of merit, urged by the appellant."   *Evitts v. Lucey*, 469 U.S. 387, 394 (1985) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)).    Failing to raise every meritorious claim on appeal does not make counsel deficient.    *Green v. Johnson,* 116 F.3d 1115, 1125-26 (5th Cir. 1997) (citing *Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir. 1989)).    When alleging ineffective assistance of appellate counsel, a petitioner "must show that the neglected claim would have had a reasonable probability of success on appeal."    *Duhamel*, 955 F.2d at 967.    Courts give great deference to professional appellate strategy for "winnowing out weaker arguments on appeal and focusing on one central issue if possible, and at most a few key issues.["]    *Jones v. Barnes*,

463 U.S. at 751-52.    This is true even where the weaker arguments have merit.    *Id.*    The applicable test is whether the omitted issue was "clearly stronger" than the issue[s] actually presented on appeal.    *See*, *e.g.*, *Diaz v. Quarterman*, 228 F. App'x 417, 427 (5th Cir. 2007) (citing *Jones v. Barnes*, 463 U.S. at 751-52)).

Here, appellate counsel reasonably determined that it was not in Bienemy's best interest to raise the aforementioned claims particularly because, as discussed herein, the claims were neither strong nor likely to succeed, and ineffective-assistance claims are more appropriately raised in an application for post-conviction relief.    Appointed counsel chose to pursue the undoubtedly stronger claims with potential merit, *i.e.*, sufficiency of the evidence and excessive sentence.    The trial record was complete and sufficed to advance those claims on appeal.    Bienemy has failed to establish that he was denied effective assistance of appellate counsel due to his attorney's failure to raise the other identified claims on direct appeal.

For the foregoing reasons, Bienemy has not demonstrated that the state court's decision rejecting these ineffective-assistance-of-counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

### 3.  Denial of Appellate Review/Incomplete Transcripts

Finally, Bienemy argues that the lack of a complete record of voir dire proceedings, closing argument, and particularly side bar and bench conferences, prevented him from

exercising his right to full and complete appellate review.    To the extent he relies on Louisiana state-court precedent to suggest the state court erred in failing to comply with state law during voir dire proceedings,[34]  his claim provides no grounds for federal *habeas* relief.    *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

In contrast, his contention that he was denied meaningful appellate review due to the failure to record portions of voir dire proceedings is cognizable on federal *habeas* review, but ultimately meritless.    On this issue, the United Fifth Circuit has explained:

> "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Accordingly, "if a State has created appellate courts as 'an integral part of the ... system for finally adjudicating the guilt or innocence of a defendant,' the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution." *Evitts v. Lucey*, 469 U.S. 387, 393, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (alteration in original) (citation omitted) (quoting *Griffin v. Illinois*, 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891 (1956)). However, "a complete verbatim transcript" is not always required to ensure that a defendant's right to meaningful appellate review is satisfied. *See Moore v. Wainwright*, 633 F.2d 406, 408 (5th Cir.1980) ("[T]he state is not obligated to automatically supply a complete verbatim transcript."). Accordingly, the record is "adequate for full appellate review" so long as it contains the portions necessary to address the alleged errors below. *Schwander v. Blackburn*, 750 F.2d 494, 497–98 (5th Cir.1985) (quoting *State v. Francis*, 345 So.2d 1120, 1125 (La.1977)). Moreover, claims based on incomplete transcripts must show that "the absence of such a transcript prejudiced [the defendant's] appeal." *Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5th Cir.1987).

---

[34]  He cites Louisiana Code of Criminal Procedure article 795(B)(2), article 843 and *State v. Pinion*, 968 So.2d 131 (La. 2007).

*Higginbotham v. Louisiana*, 817 F.3d 217, 222 (5th Cir. 2016) (footnote omitted).    Here, the trial court record included a copy of the trial transcript with all witness testimony, trial objections, and the portions of voir dire and closing argument to which objections were lodged, as well as the entire sentencing transcript.[35]    The record and transcripts were sufficient for the Louisiana Fourth Circuit Court of Appeal to review the errors raised by appellate counsel.

Bienemy's concern is only that his counsel should have had a "more complete" transcript to search for possible errors.    However, it is well-settled that the State is not "required to furnish complete transcripts so that the defendants ... may conduct 'fishing expeditions' to seek out possible errors at trial."    *Jackson v. Estelle*, 672 F.2d 505, 506 (5th Cir. 1982).    The law does not require a more complete transcript where Bienemy is unable "to indicate one specific error committed during the portions of trial not included in the record."    *United States v. Renton*, 700 F.2d 154, 159 (5th Cir. 1983).    Here, he alleges only generally:

> Bienemy's trial records contained some recordings of voir dire but does not include in-chambers discussions regarding exercise of cause and peremptory challenges, minute entries does not indicate which side excused prospective jurors and why, and the record is uncertain as to how many cause challenges were made unsuccessfully and the omission of this record would support the argument that reversible error was committed in several instance of his

---

[35]    *See* State Rec., Vol. 4 of 7 (Voir Dire), pp. 6-28; State Rec., Vol. 5 of 7 (Closing Argument), pp. 539-553 and (Multiple Bill Hearing), pp. 1-16.

challenge for cause.    It cannot be said that there were no specific prejudice occurring from the lack of a recorded record.[36]

However, conclusory allegations will not suffice to establish a constitutional violation.    To merit federal *habeas corpus* relief on a claim that state-court transcripts are unconstitutionally incomplete, the petitioner must support his claims with more than mere unsubstantiated transparent speculation.    *See Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5th Cir. 1987); *United States ex. rel. Hunter v. Follette*, 307 F.Supp. 1023, 1025 (S.D.N.Y.) ("general assertion that omitted portions of the record 'contained most of the ... trial errors which are reversible,' presents no ground for federal habeas corpus"), *aff'd*, 420 F.2d 779 (2d Cir. 1969), *cert. denied*, 397 U.S. 1067 (1970).    Bienemy has not satisfied this burden of proof.    *See Green v. Johnson*, 160 F.3d 1029, 1045 (5th Cir. 1998).

For the reasons expressed, the denial of relief on this claim was not contrary to or an unreasonable application of Supreme Court precedent.    Bienemy is not entitled to relief on this claim.

## RECOMMENDATION

**IT IS RECOMMENDED** that Bienemy's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14)

---

[36]  Rec. Doc. 4-1, p. 29.

days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[37]

New Orleans, Louisiana, this ___17th___ day of ___July___, 2017.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[37] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.